UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON

CRIMINAL ACTION NO. 04-73-DLB

UNITED STATES OF AMERICA                                                                    PLAINTIFF

VS.                         **MEMORANDUM OPINION & ORDER**

TROY PHILLIPS                                                                                        DEFENDANT

*******************************

This matter is currently before the Court upon Defendant's Motion to Suppress and Amended Motion to Suppress various firearms seized by law enforcement officers following his arrest. (Docs. # 18, 27). The government has filed its response to the motion. (Doc. # 30). Thus, the motion is now ripe for review.

An evidentiary hearing was conducted on March 25, 2005. Defendant was present for the hearing and was represented by Attorney Tim Schneider. Plaintiff was represented by Assistant U.S. Attorney Laura Voorhees. For the reasons set forth herein, Defendant's motion to suppress is hereby **GRANTED** in part, and **DENIED** in part.

**I.     Issues raised**

In his motion, Defendant seeks to suppress various firearms seized by law enforcement officers following a search of his residence.[1] In support, Defendant claims that: 1) any purported "protective sweep" of the residence was invalid, and 2) his former girlfriend, Jennifer Wenz, lacked authority to consent to a search of his home. For these

---

[1]Government exhibit 2 lists the firearms that were seized from Defendant's residence.

1

reasons, Defendant asserts that the search and seizure of the firearms violated his Fourth Amendment rights.

II.     **Findings of Fact**

On March 25, 2005, the undersigned conducted an evidentiary hearing wherein several witnesses testified. More particularly, the United States called Sergeant Bill Wilson of the Campbell County Police Department (CCPD). Defendant called Jennifer Wenz, and testified on his own behalf. After considering the testimony, and the exhibits admitted during the hearing, the Court makes the following factual findings:

1. At approximately 1:40 a.m., on March 15, 2004, Campbell County police officers responded to a call from dispatch to meet Jennifer Wenz ("Wenz") at their headquarters.

2. When the officers arrived at headquarters, Wenz informed them that she had been awakened when her boyfriend with whom she lived, Troy Phillips ("Defendant"), began yelling because one of his handguns would not fire. Wenz also informed police that she and Defendant had been living together at Defendant's residence, located at 2266 Fausz Road, Melbourne, Kentucky, for approximately one and a half years.

3. According to Wenz, an argument between the couple ensued, and the situation quickly escalated when Defendant pushed Wenz to the floor and attempted to choke her. As Wenz attempted to flee the residence, Defendant fired a gunshot in the direction of the car she was driving.

4. When Wenz arrived at Campbell County Police Headquarters, officers assisted her in obtaining an Emergency Protective Order (EPO) against Defendant. Wenz advised police that Defendant was intoxicated, and that he had a large collection of firearms in the home that included handguns, shotguns, hunting rifles, and a fully automatic weapon.

Wenz also indicated that she had a key to Defendant's residence, which she gave to police.      5.   In the course of securing the EPO, the officers obtained Defendant's criminal history, which revealed that a Domestic Violence Order (DVO) was currently in effect against him.[2]  The officers were, therefore, aware that Defendant was a "prohibited person" and any firearms that he possessed would be classified as contraband. Thereafter, the officers contacted the state district judge on duty, who authorized the EPO. Once they obtained the EPO, the officers went to Defendant's residence to serve it on him. The process of obtaining the EPO took approximately one and a half hours.

6.   Upon arrival at Defendant's home, Sergeant Wilson knocked on the front door, and receiving no response, attempted to reach Defendant via telephone.  The officers then proceeded to open the front door, but did not enter Defendant's home.[3]  After several minutes, Defendant became aware of the officers' presence, and began yelling expletives at them and threatening to shoot them.

7.   Sergeant Wilson, Officers Boggs and Marksberry thereafter attempted to persuade Defendant to come outside.  While they did so, they were able to observe Defendant as he moved throughout the house through a picture window.  At one point, Sergeant Wilson, who was positioned in close proximity to the house, heard Defendant slide a round of ammunition into the chamber of a shotgun.  Officer Marksberry then observed Defendant exit the house armed with the gun.  Defendant retreated back inside the house, only to reemerge again with the gun in one hand and a flashlight in the other,

---

[2]This order was obtained by another woman by the name of Nancy Wills.

[3]The officers did not conduct any search at that time.

which he used to scan the premises for police.

8.  Sergeant Wilson requested back-up from the Alexandria Police Department and called in the SWAT team.  At some point, Defendant placed a call to the CCPD dispatch center to inquire about the crowd of police that had gathered outside his home. Defendant eventually stepped out onto the porch, which was approximately 15-20 feet from the front door, surrendered, and was taken into custody.  Officer Boggs then transported Defendant to CCPD headquarters.

9.  Sergeant Wilson phoned Wenz, who was waiting off-site, and informed her that Defendant was in police custody.  Shortly thereafter, Wenz arrived at the house.  Wenz had previously given Sergeant Wilson her key to Defendant's residence for the purpose of removing the firearms.  Wilson phoned Campbell County Commonwealth Attorney, Jack Porter, and asked whether CCPD could search Defendant's home with Wenz's consent.  Upon receiving an affirmative answer, Wilson again asked Wenz for consent to search the residence.  Wenz agreed, and she accompanied police as they searched Defendant's home.  Wenz aided police by directing them to the places where Defendant stored firearms.

10.  The search originated in Defendant's home.  While police were conducting the search, they observed Wenz' personal effects, which corroborated Wenz's statement that she lived at the Fausz Road residence.  These items included female clothing and toiletries.  The search proceeded to Defendant's garage, where police located a Derringer pistol in a locked compartment on Defendant's motorcycle (i.e., saddlebag).[4]  The search

---

[4] Where the key to the compartment was located and who ultimately unlocked it, is not clear from the record.

4

also uncovered unassembled machine gun parts, which were found in a wooden box in Defendant's barn, and a Stevens 12-gauge shotgun, which was found on a work-bench in Defendant's basement. Police also located what they believed was the shotgun Defendant had not only brandished during the stand-off, but used to fire at Wenz as she fled the residence.

### III. Applicable Law

#### A. Protective Sweep

The Fourth Amendment permits law enforcement officers effecting an in-home arrest to conduct a warrantless "protective sweep" of the premises as a precautionary measure. *Maryland v. Buie*, 494 U.S. 325 (1990). A protective sweep is "a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.* at 327. Such a search is limited in time and scope - it may only involve a cursory inspection of those spaces where a person may be found, and last no longer than is necessary to dispel the reasonable suspicion of danger. *Id.* at 335-36. The Court in *Buie* also defined the level of suspicion required to conduct a protective sweep: a protective sweep may only be conducted where the searching officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the area swept harbors an individual posing a danger to the officer or others. *Id.* at 327.

The Sixth Circuit applied this standard in *U.S. v. Pihlblad*, No. 96-3480, 1998 WL 165150 at *1 (6th Cir. Apr. 3, 1998) (Table decision, text available on Westlaw). The facts of that case are strikingly similar to the case at bar. On the night in question, the

5

defendant's girlfriend fled her house and contacted the police after an argument between the couple turned violent. *Id*. A response team was dispatched to the girlfriend's home, where the defendant, who was armed, had barricaded himself inside. *Id*. Eventually, the defendant exited the house, surrendered, and was promptly secured by police. *Id*. Several response team members immediately entered the house to conduct a sweep to make sure nobody else was in house. *Id*. During this sweep, an officer found a .22 caliber rifle underneath a bed in an upstairs back bedroom. *Id*. After this initial search, the defendant's girlfriend, as owner of house, consented to further searches. *Pihlblad*, 1998 WL 165150 at *1.

Prior to trial, the defendant moved to suppress the rifle. *Id*. at *2. The district court denied the motion, but on appeal, the Sixth Circuit concluded that the search did not meet the requirements for a valid protective sweep. *Id*. at *3. In particular, the court noted the government's failure to point to a single articulable fact that would have caused the response team officers to reasonably think a dangerous person remained inside the house after the defendant was arrested outside. *Id*. The police had no information that a dangerous third party was hiding inside - in fact, the court concluded that, at most, they did not know if anyone else was present. *Id*. According to the court, the dangerousness of the defendant and the absence of information did not constitute the kind of articulable facts sufficient to warrant a protective sweep. *Id.* The court was further persuaded by the following facts: 1) the stand-off lasted several hours, 2) the defendant's former lawyer informed the response team that he was alone inside the house, 3) none of the officers asked the defendant's girlfriend if anyone else was inside, and 4) any danger posed by the

6

defendant subsided once he was arrested. *Pihlblad*, 1998 WL 165150 at *3. *See also U.S. v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) (stating that a defendant's dangerousness is not germane to whether the police may conduct a protective sweep). Although the court ultimately affirmed the district court's decision on other grounds, it nevertheless concluded that the search did not satisfy the requirements for a protective sweep. *Id*.

### B. Third-Party Consent

The Fourth Amendment's prohibition on warrantless searches of an individual's home is also dispensed with when voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Common authority is not to be implied from a mere property interest that a third party has in the property, but from "mutual use...by persons generally having joint access or control for most purposes." *U.S. v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) *citing U.S. v. Matlock*, 415 U.S. 164, 172 n. 7 (1974). The burden of establishing common authority rests squarely with the government. *Rodriguez*, 497 U.S. at 181.

Even if a third party does not possess actual common authority over the area that was searched, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search. *Id*. at 188-89. Apparent authority is judged by an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? *Id*. *citing Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

The Sixth Circuit has, on several occasions, explored the parameters of the consent

exception to the warrant requirement. For example, in *U.S. v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990), which was cited by the government in its response, the court held that the defendant's girlfriend, who was a joint occupant of his residence, had common authority over the premises and, therefore, gave valid consent to search the bedroom that she and the defendant shared. This holding was reaffirmed several years later in the case of *U.S. v. Gillis*, 358 F.3d 386 (6th Cir. 2004). There, the district court concluded that the defendant's girlfriend had actual authority to consent to a search of his residence because her name was on the lease. *Id*. at 391. Alternatively, the court also found that the officers who conducted the search reasonably concluded that the defendant's girlfriend had apparent authority. *Id*. On appeal, the Sixth Circuit agreed with the district court's alternative conclusion. In particular, the court focused on the information that the officers had at the time consent was obtained, namely: 1) the girlfriend had provided detailed information about the premises, and 2) the girlfriend stated that she currently lived at the residence and had been there earlier that day. *Id*. Under those circumstances, the court concluded that the officers were sufficiently well-informed to reasonably believe that the defendant's girlfriend had apparent authority to consent to a search of his home. *Id*.

With the foregoing legal framework in mind, the Court now turns to the merits of Defendant's motion to suppress.

**IV.** <u>**Analysis**</u>

In his motion to suppress, Defendant argues that the warrantless search of his home following his arrest was unconstitutional. In particular, he asserts that "there was no indication that any other individual was in the residence; therefore, [there was] no need to

conduct a protective sweep." Alternatively, Defendant argues that Wenz lacked authority to consent to a search of his home. On these bases, Defendant moves to suppress all of the firearms seized by CCPD.

The government, however, claims that "after such a lengthy and heated standoff with the defendant, the officers would have been completely inept had they not conducted a protective sweep of [his] residence." In the government's view, a protective sweep was warranted because: 1) other individuals could have come to Defendant's aid while Ms. Wenz sought help from law enforcement, 2) others could have been victimized by Defendant by the time police arrived, and 3) Defendant exhibited increasingly bold behavior during the standoff with police. Based on these facts, the government asserts that the arresting officers had a "reasonable belief that the house and basement of the home may have harbored an individual posing a danger to the officers or other victims...." The Court will address each of the government's arguments in turn.

As detailed more fully above, the Fourth Amendment permits law enforcement officers affecting an arrest either in the defendant's home, or in close proximity thereof, to conduct a protective sweep of the premises to ensure their own safety. *U.S. v. Colbert*, 76 F.3d 773 (holding that a protective sweep is not necessarily precluded when an arrest takes place outside a defendant's home). However, police must reasonably believe that someone else inside the house poses a danger to them. *Id*. at 777. In this case, the government offers little more than the possibility that someone came to Defendant's aid while Ms. Wenz procured an EPO to justify the warrantless search of his home.[5] Such a

---

[5] At the evidentiary hearing, Sergeant Wilson testified that "it was definitely a possibility" that someone else was inside Defendant's home.

lack of concrete information does not furnish an articulable basis upon which to justify a protective sweep. *Id*. at 778.

Alternatively, the government contends that the requisite level of suspicion existed because other victims may have been inside, and Defendant became increasingly brazen as the standoff continued. However, neither of these factors are relevant in a protective sweep analysis. First, police are entitled to conduct a protective sweep only when they have a reasonable suspicion of a *threat* from some other person inside the defendant's home. A victim, by definition, does not pose the kind of threat the protective sweep is designed to ferret out. Second, the defendant's own conduct or propensity for violence is not an appropriate factor for the Court to consider. *Id*. at 777 (noting that if district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep).

Notwithstanding the argument of government counsel, the Court concludes that CCPD did *not* conduct a protective sweep of the premises incident to Defendant's arrest. In reaching this conclusion, the Court specifically credits the testimony of Sergeant Wilson, who explained that all of the weapons were found during the consent search, and that no protective sweep was conducted. Wilson's testimony contradicts the government's argument that a protective sweep was warranted, much less performed. Assuming arguendo that a protective sweep did occur, CCPD did not possess the level of suspicion required by *Buie*. The Court, nevertheless, finds the government's argument that Ms. Wenz validly consented to a search of Defendant's home well-taken, and concludes that,

with one exception, the firearms discovered as a result were contraband, and should not be suppressed.

It is undisputed that, at the time of the challenged search, Defendant and Ms. Wenz had been co-habitating together for over one year. FOF at ¶2. In fact, Wenz had a key to Defendant's residence, which she turned over to police, and had been sleeping there on the night of March 14, 2004.[6] FOF at ¶¶ 2, 4. Furthermore, according to Sergeant Wilson's testimony, Wenz was able to describe the interior of Defendant's home with particularity. Defendant, however, contests Wenz's ability to consent to a search of his home. To that end, Defendant testified at the hearing that he terminated his relationship with Wenz several weeks prior to the incidents described herein, and she was not regularly residing at his house. In addition, Defendant argues that the officers should have been required to conduct further investigation to verify Wenz's authority to consent.

First, the Court finds that Defendant's testimony regarding the status of his relationship with Ms. Wenz is not credible as it is inconsistent with the balance of his own testimony, as well as the testimony of the other witnesses. *See* footnote 6. Second, with respect to the apparent authority exception to the warrant requirement, police officers are required to make further inquiries to determine the status of a consenting party only where the situation is ambiguous and would cause a reasonable person to question the authority of the party who gave consent or where the authority of the party who gave consent

---

[6]At the evidentiary hearing, Defendant testified that after he and Wenz had been out drinking all day on March 14, 2004, he brought her back to his house to sleep. Defendant's actions in dropping Wenz off at his residence is inconsistent with his testimony that he had asked her to move out.

appears to be unreasonable. *See U.S. v. Bivens*, 172 F.3d 874, *3-4 (6th Cir. 1999) *citing Rodriguez*, 497 U.S. at 189. The Court in *Rodriguez* stated:

> [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? (citation omitted). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Id*. at 188-89.

In this case, there was no ambiguity or inconsistency between Wenz's statements to police and the surrounding circumstances that would have given rise to a duty to further investigate Wenz's authority to consent to a search. Furthermore, contrary to Defendant's assertions, the critical fact in a third-party consent situation is not the actual relationship between the consenter and owner, but how that relationship appears to the officer(s) who requested consent. *U.S. v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). In light of the above, the Court concludes that the officers were sufficiently well-informed and reasonably concluded that Jennifer Wenz could, and did in fact, give valid consent to search Defendant's home. Therefore, the firearms discovered by the CCPD - with one exception, were contraband and lawfully seized by police. *U.S. v. Reed*, 141 F.3d 644 (6th Cir. 1998).

At the hearing, Sergeant Wilson also testified that the officers located a Western Derringer 22 magnum pistol inside a saddlebag on Defendant's motorcycle in the garage.[7]

---

[7]This firearm is item 19 in Count 1 of the indictment.

12

The testimony also revealed that the saddlebag was locked, although Wilson was unable to recall who retrieved the key and ultimately unlocked it. Although Wenz testified that she had unfettered access to Defendant's house and garage, she also was unable to recall who retrieved the key.

Courts have routinely considered whether a third party can consent to a search of a container or compartment where contraband is found. *See Bivens*, 172 F.3d 874. Relevant factors generally include: 1) the type of container/compartment and 2) precautions taken by the owner to manifest his/her subjective expectation of privacy (i.e., locking it or expressly forbidding others to open it). *U.S. v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992).

In this case, a saddlebag, unlike a purse or briefcase/suitcase, is not the type of container or compartment that generally commands a high degree of privacy. However, the testimony at the hearing established that Defendant kept the saddlebag locked, which manifested his intention to restrict others' access thereto. While Wenz did have full access to Defendant's house, including the garage, she did not have the key to the saddlebag. Based on these facts, and the fact that the officers were aware that the motorcycle was owned by Defendant, the Court concludes that Wenz lacked authority to consent to a search of the saddlebag.

### V.     Conclusion

Therefore, for the reasons stated herein, **IT IS ORDERED as follows:**

1. Defendant's Motion to Suppress (Doc. # 18) and Amended Motion to Suppress (Doc. # 27) are hereby **GRANTED** only with respect to the Western Derringer 22 magnum pistol (Item 19 in Count 1 of the indictment);

2. Defendant's motions to suppress (Docs. # 18, 27) are hereby **DENIED** in all other respects regarding the other 21 firearms;

3. This matter is set for a **Status Conference** on **April 29, 2005** at **10:00 a.m.** at the U.S. Courthouse, Covington, Kentucky, at which time the Court will schedule this matter for trial;

4. The time period from February 9, 2005 through the date of this Order, totaling 76 days, is deemed **excludable time** pursuant to Title 18, United States Code § 3161(h)(1)(F).

This 26th day of April, 2005.

Signed By:
*David L. Bunning*   *DB*
United States District Judge

G:\DATA\ORDERS\CovCrim\04-73-MOOsuppression.wpd